**[This opinion has been published in *Ohio Official Reports* at 71 Ohio St.3d 513.]**

THE  STATE EX REL. MAURER ET AL., APPELLANTS, *v.* SHEWARD,  JUDGE, APPELLEE.

WILKINSON, DIR., ET AL., APPELLANTS, *v.* MAURER ET AL., APPELLEES.

**[Cite as *State ex rel. Maurer v. Sheward*, 1994-Ohio-496.]**

*Constitutional law—Commutations of death sentences by  Governor not  subject to application process outlined in R.C. 2967.07—Section 11, Article III, Ohio Constitution, construed.*

(Nos. 92-1350 and 93-1165—Submitted September 20, 1994—Decided December 30, 1994.)

APPEALS from the Court of Appeals for Franklin County, Nos. 91AP-1442, 92AP-674, 92AP-675, 92AP-677 and 92AP-678.

_____

Case No. 93-1165

{¶ 1} On January 10, 1991, two business days before the expiration of his term in office, former Ohio Governor Richard F. Celeste commuted the sentences of eight inmates and granted one full pardon.  Two additional inmates also were granted clemency, but their appeals below were either withdrawn or properly found to be moot.[1]

_____

1. In his application for clemency, Saram Bellinger stated that he was convicted of aggravated robbery with firearm specifications and was sentenced to an indefinite term of five to twenty-five years' imprisonment, to be served consecutively with three years' actual incarceration. Both former Governor Celeste and Governor George V. Voinovich commuted that sentence to time served. Bellinger withdrew his appeal.

According to his application for clemency, Freddie Moore was convicted of operating a gambling house and received a suspended sentence.  Former Governor Celeste granted Moore a full and unconditional pardon on January 11, 1991, after which Governor Voinovich pardoned him on August 24, 1992.  The court of appeals noted that his appeal had been rendered moot by the pardon from Governor Voinovich.

{¶ 2} Donald Lee Maurer, Leonard Jenkins, Debra Brown, Willie Lee Jester, Elizabeth Green, Lee Seiber and Rosalie Grant had been convicted of aggravated murder and sentenced to death. With the exception of Rosalie Grant, former Governor Celeste commuted the death sentences to life imprisonment without eligibility for parole. The Governor commuted Rosalie Grant's death sentence to life in prison with no restriction as to parole eligibility. Ralph DeLeo had been convicted of murder and was serving a sentence of fifteen years to life. Former Governor Celeste commuted his sentence to time served. John Salim had been convicted of felonious assault. He was serving a sentence of six to twenty-one years when former Governor Celeste granted him a full pardon.

{¶ 3} When the former Governor granted the pardon and commutations, the Ohio Adult Parole Authority ("APA") had not been asked to conduct investigations or formulate recommendations for seven of the applicants who had been sentenced to death. Instead, their applications for clemency were filed directly with the former Governor. With respect to Ralph DeLeo and John Salim, their applications were submitted to the APA between December 6 and December 17, 1990. By January 9, 1991, the APA had taken no final action on the two applications. On that day, a representative from former Governor Celeste's office called the APA to request that it expedite review of the two applications. The APA responded that it could not complete the review process in two business days.

{¶ 4} On January 29, 1991, George Wilson, Director of the Department of Rehabilitation and Correction, and John Shoemaker, Chief of the APA,[2] filed a complaint for declaratory judgment in the Franklin County Court of Common Pleas

---

2. Reginald Wilkinson was substituted as a party to this action pursuant to Civ.R. 25(D)(1) when he replaced George W. Wilson as the Director of Rehabilitation and Correction effective March 25, 1991.

Jill Goldhart was substituted as a party for John W. Shoemaker when she became Acting Chief of the APA.

seeking a determination that former Governor Celeste's actions were in contravention of Section 11, Article III of the Ohio Constitution, and R.C. Chapter 2967. The plaintiffs sought a declaration that the pardon and commutations granted to the defendants by former Governor Celeste were void. Current Governor George V. Voinovich successfully petitioned the court for leave to intervene as a plaintiff.

{¶ 5} On March 6, 1991, the defendants moved to dismiss the complaint for lack of jurisdiction, alleging that the matter was nonjusticiable, because any judicial declaration as to the validity of executive clemency would unconstitutionally infringe upon the Governor's clemency power. The trial court overruled the motion on September 26, 1991. Following a bench trial, the trial judge issued a decision and entry granting a declaratory judgment to plaintiffs. The court explained that "full compliance with the requirements of R.C. 2967.07 and R.C. 2967.12 is a condition precedent to the valid exercise of the clemency power by the Governor * * *" and that the pardon and commutations granted by former Governor Celeste were invalid.

{¶ 6} The eleven defendants appealed in six separate notices of appeal to the Tenth District Court of Appeals; their appeals were consolidated for decision. The court of appeals reversed the decision of the trial court. After considering the language of Section 11, Article III, the court of appeals found that the clause that subjects the Governor's clemency power to "such regulations, as to the manner of applying for pardons" applies only to the Governor's power to grant pardons. The court stated that the constitutional provision does not provide the General Assembly with authority to regulate the Governor's power to grant commutations. The court of appeals also determined that regulations enacted by the General Assembly apply to individuals applying for pardons but do not affect the ability of the Governor to grant a pardon on his own initiative. Specifically, the court of appeals held that nothing in Section 11, Article III of the Ohio Constitution or R.C. Chapter 2967

could limit the Governor's power to grant clemency on his own initiative, even if he chose to do so without first receiving a recommendation from the APA.

{¶ 7} This cause is now before this court upon the allowance of a motion to certify the record.

Case No. 92-1350

{¶ 8} The second cause submitted for review emerged from the underlying declaratory judgment action discussed above. On December 10, 1991, after the trial court denied the defendants' motion to dismiss the action, but prior to trial, the defendants sought a writ of prohibition in the Franklin County Court of Appeals. Defendants urged the court of appeals to bar the trial judge from exercising judicial power over the declaratory judgment action, because the action did not present a justiciable question. On January 28, 1992, a referee concluded that the defendants' arguments lacked merit and recommended that the court of appeals dismiss the prohibition action on the basis of this court's decision in *State ex rel. Ney v. Governor* (1991), 58 Ohio St.3d 602, 567 N.E.2d 986. The court of appeals adopted the referee's recommendation and dismissed the petition.

{¶ 9} This cause is now before this court upon an appeal as of right and has been consolidated with case No. 93-1165 for purposes of final determination.

———————————

*Ken Murray*, for appellant Debra Brown in case No. 92-1350.

*Barry W. Wilford* and *Dennis Pusateri*, for Ralph DeLeo.

*S. Adele Shank*, for Rosalie Grant.

*D. Shannon Smith* and *Timothy A. Smith*, for Elizabeth Green.

*Elizabeth A. McNellie*, *Joy Maciejewski* and *Sean M. McAvoy*, for appellant Leonard Jenkins in case No. 92-1350.

*Shaw, Pittman, Potts & Trowbridge*, *Thomas C. Hill*, *Alvin Dunn* and *Joseph Figini*; *Matan & Smith* and *Steven L. Smith*, for Willie L. Jester.

*Sowash, Carson & Shostak* and *Herman A. Carson*, for Donald Maurer.

*Richard B. Igo*, for Freddie Moore and John Salim.

*Gregory W. Meyers*, for Lee Seiber.

*Michael Miller*, Franklin County Prosecuting Attorney, and *Bonnie L. Maxon*, Assistant Prosecuting Attorney, for appellee in case No. 92-1350.

*Lee Fisher*, Attorney General, *John J. Gideon* and *Jack W. Decker*, Assistant Attorneys General, for appellants in case No. 93-1165 and urging affirmance for *amici curiae*, George Voinovich, Reginald Wilkinson and Jill Goldhart in case No. 92-1350.

*K. Ronald Bailey*, for appellee Debra Brown in case No. 93-1165.

*Melanie S. Corcoran*, *James W. Brown III* and *Christopher P. Thorman*, for appellee Leonard Jenkins in case No. 93-1165.

*Steven H. Steinglass*, urging dismissal or affirmance for *amicus curiae*, Law Professors' Brief Amicus Curiae Committee in case No. 93-1165.

*Kevin Francis O'Neill*, *Peter Joy*, *Daniel T. Kobil* and *Paul Moke*; *Moots, Cope & Stanton* and *Benson A. Wolman*, urging affirmance for *amicus curiae*, American Civil Liberties Union of Ohio Foundation in case No. 93-1165.

*Squire, Sanders & Dempsey* and *David J. Young*, urging affirmance for *amicus curiae*, Catholic Conference of Ohio in case No. 93-1165.

*Law Enforcement Legal Association, Inc.*, *Paul L. Cox* and *Walter T. Florence*, urging reversal for *amicus curiae*, Fraternal Order of Police of Ohio, Inc., in case No. 93-1165.

———————————

**Per Curiam**.

{¶ 10} Case No. 93-1165 requires this court to decide three issues: (1) Does Section 11, Article III of the Ohio Constitution authorize the General Assembly to prescribe procedural prerequisites to the exercise of the Governor's clemency power?; (2) If so, does the General Assembly have the authority to prescribe procedural prerequisites for commutations as well as pardons?; and (3) Has the

General Assembly in fact imposed procedural prerequisites upon the Governor's clemency power?

{¶ 11} We will address case No. 92-1350, which raises issues also implicated by case No. 93-1165, in Part IV of this opinion.

I

{¶ 12} Section 11, Article III of the Ohio Constitution provides the authority for the Governor's clemency power:

"He [the Governor] shall have power, after conviction, to grant reprieves, commutations, and pardons, for all crimes and offenses, except treason and cases of impeachment, upon such conditions as he may think proper; subject, however, to such regulations, as to the manner of applying for pardons, as may be prescribed by law. Upon conviction for treason, he may suspend the execution of the sentence, and report the case to the general assembly, at its next meeting, when the general assembly shall either pardon, commute the sentence, direct its execution, or grant a further reprieve. He shall communicate to the general assembly, at every regular session, each case of reprieve, commutation, or pardon granted, stating the name and crime of the convict, the sentence, its date, and the date of the commutation, pardon, or reprieve, with his reasons therefor."

{¶ 13} Section 11, Article III was adopted as part of extensive revisions to the Constitution made in 1851. Prior to 1851, the Governor's clemency power was set forth in Section 5, Article II of the Ohio Constitution of 1802, which provided in its entirety: "He [the Governor] shall have the power to grant reprieves and pardons, after conviction, except in cases of impeachment." This section was modeled after Section 2, Article II of the United States Constitution, which gives the President the "Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment."

{¶ 14} Both the United States Constitution and the Ohio Constitution of 1802 conferred broad powers of executive clemency. The only limitations on the

clemency power were that it could be exercised only after conviction (Ohio Constitution) and that clemency could not be granted in cases of impeachment (both Ohio and United States Constitutions). Neither Constitution authorized the enactment of laws to curtail the executive's clemency power. However, with the adoption of Section 11, Article III, Ohio significantly altered its provision on executive clemency.

{¶ 15} Although the Ohio Constitution places the clemency power in the hands of the Governor, that power clearly is not absolute. The Governor's clemency power is subject to whatever restrictions are contained in Section 11, Article III. *See State v. Morris* (1978), 55 Ohio St.2d 101, 111, 9 O.O.3d 92, 98, 378 N.E.2d 708, 714. These restrictions provide that clemency may be granted only after conviction, may be granted only partially in cases of treason, and not at all in cases of impeachment.

{¶ 16} Though the Governor's power to grant clemency is limited, the only limits on the clemency power are those specifically authorized by Section 11, Article III. *Knapp v. Thomas* (1883), 39 Ohio St. 377, 392. The General Assembly may not interfere with the discretion of the Governor in exercising the clemency power. *Morris*, 55 Ohio St.2d at 111, 9 O.O.3d at 98, 378 N.E.2d at 714. Likewise, the Governor's exercise of discretion in using the clemency power is not subject to judicial review. *See State ex rel. Whiteman v. Chase* (1856), 5 Ohio St. 528, 535; *Knapp*, 39 Ohio St. at 391.[3]

---

3. Even though courts may not review the substantive decision of the Governor on whether to exercise clemency in a particular case, courts may consider whether constitutionally authorized limitations on the clemency power have been respected. For example, if a Governor attempted to grant a pardon before the recipient had been convicted, the purported grant would be outside the scope of the clemency power conferred by Section 11, Article III and constitutionally invalid from the outset. Similarly, a purported pardon is not really a pardon at all if constitutionally authorized procedural limitations on the pardoning power are ignored. *Knapp* held that a pardon, once granted and delivered, is irrevocable. *Id.*, 39 Ohio St. 377, syllabus. However, *Knapp* did not consider the issue of constitutional limitations on the Governor's power. An attempted pardon which is granted without adherence to constitutionally authorized requirements is invalid, and is not immune to challenge.

{¶ 17} The specific limitation at issue in this case comes from the "subject to" clause of Section 11, Article III:

"He [the Governor] shall have power, after conviction, to grant reprieves, commutations, and pardons, for all crimes and offenses, except treason and cases of impeachment, upon such conditions as he may think proper; *subject, however, to such regulations, as to the manner of applying for pardons, as may be prescribed by law*." (Emphasis added.)

{¶ 18} It is apparent from the structure of the first sentence of Section 11 that the "subject to" clause modifies the word "power." The first clause of the first sentence provides the Governor the power to grant executive clemency. The presence of the word "however" in the second clause indicates a limit on that power. Thus, the Governor's *power* to grant clemency is limited by the "subject to" clause. However, the authority granted to the General Assembly under the "subject to" clause is itself limited to regulating the application process. Furthermore, as we conclude below, the "subject to" clause only provides the General Assembly with the authority to regulate "as to the manner of applying for *pardons*." (Emphasis added.) Consistent with *Knapp* and *Morris*, the authority to issue regulations is further limited in that those regulations may not interfere with the Governor's discretion to grant or deny pardons.

{¶ 19} We believe that the authority to prescribe regulations "as to the manner of applying for pardons" provides the General Assembly with the authority to prescribe a regulatory scheme governing the manner and procedure of applying for pardons. Unlike the court of appeals, we do not believe that the General Assembly has the authority to regulate only the applicants for pardons. We interpret the language of the "subject to" clause as providing the General Assembly with the authority to establish a regulatory scheme that includes prerequisites to the

exercise of the Governor's power to grant pardons.[4] Our interpretation is consistent with the purpose of the "subject to" clause, which was to provide the General Assembly with the authority to establish procedural safeguards against the granting of pardons. The drafters of Section 11 were concerned that without such safeguards, the Governor might grant pardons without thorough consideration or might be too easily influenced by political factors to grant or deny clemency for reasons other than the merits of an inmate's claim. See 1 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio 1850-1851 (1851) 306-307. Consistent with the language and purpose of Section 11, the authority to regulate the application process must also include the authority to establish prerequisites to the Governor's exercise of the power to grant pardons. To exempt the Governor from the "subject to" clause would allow the Governor to circumvent the procedural safeguards for which the clause was adopted, rendering the clause meaningless.

{¶ 20} For the foregoing reasons, we hold that the General Assembly is authorized by Section 11, Article III of the Ohio Constitution to prescribe procedural prerequisites to the application process for executive pardons. In order to be valid, any grant of a pardon must be based on an application that complies with the procedural prerequisites. The General Assembly is not authorized to prescribe substantive regulations concerning the Governor's discretion in the use of the clemency power, or in any way intrude on the discretion of the Governor. For example, the General Assembly could not, acting under the limited authority provided by Section 11, Article III, enact a statute requiring the Governor to accept

---

4. Interpreting the "subject to" clause as authorizing the General Assembly to set up a regulatory scheme which includes prerequisites to the exercise of the Governor's pardoning power is consistent with our earlier analysis where we found that the clemency power is subject to whatever limits are set forth in Section 11, Article III. In the case of the "subject to" clause, the limit takes the form of an authorization to the General Assembly to issue regulations that will themselves limit the Governor's pardoning power.

the recommendation of the APA in the exercise of his clemency power. Likewise, the General Assembly could not enact a statute forbidding the Governor from exercising the clemency power in any specific class of cases.

II

{¶ 21} Having determined that Section 11, Article III authorizes the General Assembly to prescribe procedural regulations as to the application process for pardons, we next consider whether that authority extends to any other types of clemency.

{¶ 22} The language of Section 11 expressly provides the extent of the General Assembly's authority to regulate the application process for executive clemency: "[The Governor] shall have power * * * to grant reprieves, commutations, and pardons * * *; subject, however, to such regulations, *as to the manner of applying for pardons*, as may be prescribed by law." (Emphasis added.) The language of Section 11 clearly provides the General Assembly with the authority to regulate the application process for pardons. However, the "subject to" clause does not implicate in any way the Governor's powers with respect to commutations or reprieves.[5] The issue then becomes whether commutations, even though they are not mentioned within the "subject to" clause, may also be regulated.

{¶ 23} Plaintiffs argue that the authority to regulate the application process for "pardons" also includes the authority to similarly regulate commutations. They reach that conclusion based upon their perception that the word "pardons" may be interpreted broadly to include all types of executive clemency. In other words, the

---

5. Though the validity of a reprieve is not at issue in this case, we believe that any interpretation of the "subject to" clause is necessarily incomplete without considering each of the three types of executive clemency. In terms of reprieves, we believe that they are fundamentally different from pardons. A reprieve is temporary; execution of a sentence is delayed when the Governor grants a reprieve. A reprieve is not permanent in the way that a pardon is. Reprieves, by their very nature, often require prompt, totally unfettered action by the Governor. Consequently, we find that reprieves are not governed by the "subject to" clause and, consistent with our analysis below, the General Assembly may not regulate the application process for reprieves.

plaintiffs argue that commutations are a subset of pardons, and by using the word "pardons" the drafters intended that the General Assembly have the power to regulate commutations as well as pardons.

{¶ 24} We do not believe that commutations are a subset of pardons. The first step in determining the meaning of a constitutional provision is to look at the language of the provision itself. Where the meaning of a provision is clear on its face, we will not look beyond the provision in an attempt to divine what the drafters intended it to mean. *Slingluff v. Weaver* (1902), 66 Ohio St. 621, 64 N.E. 574.

{¶ 25} The meaning of Section 11 is obvious after a careful review of that provision. The first sentence provides the Governor with the power to grant *three* different types of clemency—reprieves, commutations and pardons. The end of the first sentence is equally clear in providing the General Assembly with the authority to regulate the application process for only *one* type of clemency—pardons. The language of Section 11 could not be clearer in limiting the General Assembly's authority to regulate only pardons. Moreover, any argument that commutations are a subset of pardons is, as shown below, simply unsupportable.

{¶ 26} The canons of statutory interpretation, which guide our interpretation of constitutional and statutory text, support the conclusion that the word "pardons" in the "subject to" clause does not include commutations. This court has consistently held that words used more than once in the same provision have the same meaning throughout the provision, unless there is clear evidence to the contrary. *State ex rel. Bohan v. Indus. Comm.* (1946), 146 Ohio St. 618, 33 O.O. 92, 67 N.E.2d 536, paragraph one of the syllabus, overruled on other grounds, *State ex rel. Walker v. Indus. Comm.* (1979), 58 Ohio St.2d 402, 12 O.O.3d 347, 390 N.E.2d 1190. The three types of clemency are each listed together four different times in Section 11. In fact, the only time one type of clemency is mentioned alone is when "pardons" appears within the "subject to" clause. To define pardons to include commutations when the two types of clemency are each

listed together so many times within the same small section would be nonsensical. Additionally, interpreting "pardons" to include commutations has the problem of rendering the presence of the word "commutations" useless. Our prior cases require that we reject that result, because if possible we must give meaning to every word in a provision. *Steele, Hopkins & Meredith Co. v. Miller* (1915), 92 Ohio St. 115, 110 N.E. 648.

{¶ 27} The argument that commutations are a subset of pardons is also contrary to our previous decisions where we have held that commutations and pardons are two entirely different types of clemency. In *In re Victor* (1877), 31 Ohio St. 206, 207, this court defined a commutation as "a change of punishment from a higher to a lower degree, in the scale of crimes and penalties fixed by the law * * *." In *State ex rel. Atty. Gen. v. Peters* (1885), 43 Ohio St. 629, 650-651, 4 N.E. 81, 87-88, this court defined pardons:

"A pardon discharges the individual designated from all or some specified penal consequences of his crime. It may be full or partial, absolute or conditional.

"A full and absolute pardon releases the offender from the entire punishment prescribed for his offense, and from all the disabilities consequent on his conviction.

"[A] commutation is 'the change of a punishment to which a person has been condemned into a less severe one.'

"*It is not a conditional pardon*, but the substitution of a lower for a higher grade of punishment * * *." (Citation omitted and emphasis added.)

{¶ 28} The *Peters* case conclusively established that pardons are different from, and do not include, commutations. The interpretation of Section 11 ends here, with the unmistakable conclusion that the "subject to" clause does not provide the authority to regulate commutations.

{¶ 29} Instead of approaching Section 11 by considering its plain language, the dissent attempts to justify its interpretation that the word "pardons" in the

"subject to" clause includes commutations by wading into the morass of speeches made by the drafters of Section 11. The dissent bases its interpretation on the perception that because several drafters did not distinguish between commutations and pardons in their speeches regarding the reporting clause of Section 11, they intended that the word pardon in the "subject to" clause include commutations. Such a conclusion is simply incomprehensible. We do not agree that imprecise speeches by individual drafters give courts *carte blanche* to ignore the plain language of a constitutional provision. Those drafters were precise when they *wrote* the reporting provision. That provision, which is the last sentence of Section 11, precisely distinguishes among the three different types of clemency: "He shall communicate to the general assembly, at every regular session, each case of *reprieve, commutation, or pardon* granted, stating the name and crime of the convict, the sentence, its date, and the date of the *commutation, pardon, or reprieve*, with the reasons therefor." (Emphasis added.) Moreover, as we stated in *Slingluff*, we will not look to the history of a provision where, as here, the language of the provision is clear.

{¶ 30} Given our tradition of interpreting statutory and constitutional language, the only plausible interpretation of Section 11 is the one we adopt today—the "subject to" clause provides authority to the General Assembly to regulate the application process for pardons and not commutations.

### III

{¶ 31} Because we have established that Section 11, Article III authorizes the General Assembly to regulate the application process for pardons, we must determine whether the General Assembly has, in fact, prescribed any regulations. Plaintiffs claim that the General Assembly, through R.C. Chapter 2967 in general and R.C. 2967.07 in particular, has established procedural requirements that must be fulfilled before a pardon may be granted. Defendants argue that R.C. 2967 is

merely a directory statute setting forth procedures which the Governor may choose to ignore.

{¶ 32} R.C. 2967.07 provides:

"All applications for pardon, commutation of sentence, or reprieve shall be made in writing to the adult parole authority. Upon the filing of such application, or when directed by the governor in any case, a thorough investigation into the propriety of granting a pardon, commutation, or reprieve shall be made by the authority, which shall report in writing to the governor a brief statement of the facts in the case, together with the recommendation of the authority for or against the granting of a pardon, commutation, or reprieve, the grounds therefor and the records or minutes relating to the case."

{¶ 33} As we determined above, Section 11, Article III of the Ohio Constitution authorizes the General Assembly to regulate the application process only with respect to pardons, and not commutations or reprieves. Because the grant of the clemency power with respect to commutations and reprieves is unfettered, any regulation by the General Assembly that acts to limit the Governor's power to grant commutations or reprieves is a violation of the Constitution. To the extent that the regulatory scheme under R.C. Chapter 2967 places limits or preconditions on the Governor's power to grant commutations or reprieves, it is unconstitutional and void. We are particularly concerned with R.C. 2967.07. As we note below, the General Assembly in R.C. 2967.07 has provided a regulatory prerequisite to the granting of commutations, as well as pardons and reprieves: a clemency application must be made to and acted on by the Adult Parole Authority before the Governor may grant clemency. We do not question the wisdom of this legislation, but it has no constitutional underpinnings beyond pardons.

{¶ 34} The question becomes whether we may sever the unconstitutional references to commutations and reprieves from the otherwise constitutional portions of R.C. 2967.07. R.C. 1.50 provides that statutory provisions are

presumptively severable: "If any provision of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable." In order to sever a portion of a statute, we must first find that such a severance will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part. We set forth the test for determining whether an unconstitutional provision may in fact be severed in *Geiger v. Geiger* (1927), 117 Ohio St. 451, 466, 160 N.E. 28, 33:

"'(1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?'" *Id.*, quoting *State v. Bickford* (1913), 28 N.D. 36, 147 N.W. 407, paragraph nineteen of the syllabus.

{¶ 35} The references to commutations and reprieves meet the test for severability provided in *Geiger*. R.C. 2967.07 provides a regulatory scheme that imposes the same regulations upon the three types of clemency. In other words, it is as if there were three separate but identical statutes each regulating one type of clemency. Therefore, the regulation of each type of clemency is essentially independent of the others. Because of their independence, the regulation of commutations and reprieves are not so connected to the regulation of pardons that without reference to commutations and reprieves the regulatory scheme will not give effect to the intention of the General Assembly. The requirements of the regulatory scheme concerning pardons will not change. We need only excise the constitutionally offensive references to commutations and reprieves in R.C.

2967.07 and need not add any other language in order to give effect to its regulatory scheme. Thus, we hold that, pursuant to the Ohio Constitution, R.C. 2967.07 may regulate the application process for pardons only.

{¶ 36} Because only a portion of the statute is constitutional, only the Governor's grant or denial of a pardon is "subject to" the application process outlined in R.C. 2967.07. His power to grant or deny commutations is not subject to those regulations. Therefore, the commutations at issue in this case remain valid.

{¶ 37} The validity of the one pardon granted without an application in compliance with the procedure outlined in R.C. 2967.07 remains at issue. We must now determine whether this noncompliance precluded the Governor from granting a pardon. As we noted above, the Governor exercises the pardoning power "subject to" these regulations, even though the General Assembly is not authorized by Section 11, Article III to intrude in any way upon the Governor's discretion to grant or deny a pardon.

{¶ 38} The exercise of the pardoning power involves two distinct elements—the application process and the consideration process. The phrase "manner of applying" for pardons includes the entire application process, which encompasses the filing of the application itself, the investigation, the recommendation, and the full report compiled by the APA. We find that the General Assembly's authority to regulate the application process extends to the time just before the Governor reaches a substantive decision concerning a pardon. Once this point is reached, the General Assembly's constitutionally granted authority to regulate procedurally the pardoning power of the Governor is at its end.

{¶ 39} By its clear terms, R.C. 2967.07 contemplates that an investigation by the APA that leads to a recommendation for or against a pardon may be initiated in two distinct ways. The first way is for an applicant (or someone on the applicant's behalf) to file a pardon request directly with the APA. The second way is for the Governor to direct that the investigation occur. The real issue in this case

is whether the Governor is required to await the APA investigation and recommendation before he may grant a pardon.

{¶ 40} The first sentence of R.C. 2967.07 requires that *all* applications for pardons *shall* be made to the APA. The General Assembly has chosen the word "all" to indicate that every request for a pardon must go to the APA for evaluation. In addition, the General Assembly has chosen to use the word "shall" in R.C. 2967.07 three times in connection with the APA's role in the pardon application process. This indicates the mandatory nature of the APA investigation and of the entire APA involvement in the application process.

{¶ 41} We hold that R.C. 2967.07 mandates that the APA investigation report and recommendation must be presented to the Governor before he may grant a pardon. This mandate includes those situations in which the Governor initiates the APA investigation.

{¶ 42} The requirement of APA involvement by the General Assembly is permissible, because it is within the General Assembly's authority to "legislate in aid of the [pardoning] power." *Knapp*, 39 Ohio St. at 392-393. The statute is meant to ensure that information about each person for whom a pardon is considered will be available to the Governor, so that an informed decision may be made. This is precisely the type of regulation "as to the manner of applying for pardons" contemplated by Section 11, Article III. The Governor's power to grant pardons is subject to this procedural mechanism, which requires the APA to investigate, recommend and report before the Governor may grant a pardon.

{¶ 43} Because the Governor has ultimate substantive discretion whether to grant or deny a pardon, there is no requirement that the Governor place any weight whatsoever on either the investigative report or the recommendation of the APA. However, the power to disregard is not equivalent to the power to proceed without the procedural requirements first being fulfilled. The abuses sought to be remedied by addition of the "subject to" clause in Section 11, Article III are those that occur

during the application process. Thus, the process is subject to regulation, and procedural requirements may be placed on the Governor's power to pardon. To find otherwise would be to read the "subject to" clause out of Section 11, Article III, when it is clear that that clause affects the *power* of the Governor to grant pardons.

{¶ 44} Defendants argue that if R.C. 2967.07 regulates in a way which affects the Governor's power to pardon, then the statute is unconstitutional. However, the regulations placed on the pardoning power are those authorized by the Constitution itself. See *Knapp*, 39 Ohio St. at 392. Since R.C 2967.07 was enacted pursuant to the authority of Section 11, Article III, the statute is constitutional to the extent that it regulates the application process for pardons.

{¶ 45} We recognize that the pardoning power conferred on the Governor by the Ohio Constitution is essential to ensure justice in particular cases. Indeed, as Alexander Hamilton stated in The Federalist No. 74 (Cooke Ed. 1961) 500-501, in support of the broad clemency power conferred on the President by Section 2, Article II of the United States Constitution: "Humanity and good policy conspire to dictate, that the benign prerogative of pardoning should be as little as possible fettered or embarrassed. The criminal code of every country partakes so much of necessary severity, that without an easy access to exceptions in favor of unfortunate guilt, justice would wear a countenance too sanguinary and cruel."

{¶ 46} However, the power to pardon is subject to abuse. The framers therefore authorized the Ohio General Assembly to enact regulations to limit those abuses, thereby allowing procedural requirements which limit the Governor's exercise of the power. In R.C. Chapter 2967, the General Assembly has enacted the authorized regulations as safeguards against abuse. Those safeguards do not stand in the way of the Governor's substantive exercise of the pardoning power. It would take an amendment to Ohio's Constitution to authorize substantive limitations. Nevertheless, the safeguards do impose procedural requirements which

were bypassed in this case. The pardon purportedly granted was invalid from the outset.

{¶ 47} *Amicus curiae* American Civil Liberties Union of Ohio Foundation argues that if this court reverses the decision of the court of appeals, the cause should be remanded to the court of appeals to resolve issues that court did not reach in its previous opinion. However, we have determined, as a matter of law, that former Governor Celeste acted outside the scope of his constitutionally conferred clemency authority in granting the pardon. The other assignments of error raised in the court of appeals cannot alter that finding. The judgment of the court of appeals in case No. 93-1165 is affirmed with respect to the commutations and reversed as to the pardon. The declaratory judgment of the trial court that the pardon is invalid is reinstated.

IV

Case No. 92-1350

{¶ 48} In case No. 92-1350, the defendants in case No. 93-1165 appeal from the court of appeals' denial of their complaint for a writ of prohibition. Defendants contend that the court of appeals erred in refusing to stop the trial court from exercising jurisdiction in the declaratory judgment action, which is the subject of the appeal in case No. 93-1165. We find that our resolution of the issues in case No. 93-1165 is determinative of the issues raised in this appeal, and that any remaining issues therefore are moot. Accordingly, we affirm the judgment of the court of appeals in case No. 92-1350.

*Judgment affirmed*
*in case No. 92-1350.*
*Judgment affirmed in part*
*and reversed in part*
*in case No. 93-1165.*

A.W. SWEENEY, WRIGHT and EVANS, JJ., concur.

MOYER, C.J., concurs separately.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur in part and dissent in part.

JOHN R. EVANS, J., of the Third Appellate District, sitting for RESNICK, J.

_____

**MOYER, C.J., concurring separately.**

{¶ 49} I concur in the judgment and opinion of the majority that apply Section 11, Article III, Ohio Constitution and R.C. Chapter 2967 as clearly intended by the drafters of the Ohio Constitution and by the General Assembly. I write separately to discuss an aspect of the majority decision that demonstrates one of the very difficult responsibilities of being a judge.

{¶ 50} The majority's careful and restrained interpretation produces the only conclusion that is faithful to the words of the Constitution and to R.C. Chapter 2967. We are not required or even requested to review the wisdom or the judgment of the acts of Governor Celeste when he pardoned and commuted the sentences of the defendants two business days before he left office. If that were the issue, my vote would be to invalidate all of the Governor's actions. That, however, is not the issue we are required to decide. Nor is there any dispute that even if the Governor were required by the Constitution and the statutes to receive a report from the Ohio Adult Parole Authority before granting a pardon or commutation, he could disregard the recommendation contained in the report and grant the pardon or commutation. Indeed, the manner in which Governor Celeste granted the commutations and pardon in the cases before us suggests that even if he had followed the statutory procedure, it is unlikely he would have followed a recommendation of the Adult Parole Authority that any of the defendants not be granted a commutation or pardon. It appears that that is precisely the reason the dissent advocates an amendment to the Constitution that would limit the power of the Governor to grant pardons, commutations and reprieves beyond the limitations

in Section 11, Article III. As Chief Justice Marshall observed, "[c]ourts are the mere instruments of the law, and can will nothing." *Osborn v. Bank of United States* (1824), 22 U.S. (9 Wheat.) 738, 866, 6 L.Ed. 204, 234.

{¶ 51} The majority opinion reflects the fundamental role of judicial responsibility and restraint. Every judge faithful to the judicial oath of office must be able to separate the law from his or her personal views when deciding cases. That fundamental aspect of judging is a unique challenge to judicial decision-making. In separating personal opinion from the constitutional issues before us, I am reminded of the observation that "[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned." *Home Bldg. & Loan Assn. v. Blaisdell* (1934), 290 U.S. 398, 483, 54 S.Ct. 231, 256, 78 L.Ed. 413, 452 (Sutherland, J., dissenting). There is no comfort in applying the plain language of the Ohio Constitution to the facts in the case before us. The conduct of the death-penalty defendants that produced their convictions and death sentences is the lowest form of human behavior. If the death penalty is appropriate for anyone, it is appropriate for them. However, that personal belief has no relevance to the legal issues before us and must be separated from the judicial decision we are required to render. The words of the Constitution can be given their plain meaning only as applied by the majority decision. To analyze away the words of the Constitution is to engage in an act of corroborating one's own belief that the Governor's actions were unwise.

{¶ 52} The distribution of power among the three branches of government rests on a delicate balance. It is a fundamental element of American government. *S. Euclid v. Jemison* (1986), 28 Ohio St.3d 157, 28 OBR 250, 503 N.E.2d 136. We are urged by the successor in the office of governor to exercise our constitutional power to invalidate the commutations and a pardon of his predecessor in office. Restraint should characterize the exercise of judicial power in such a case. If we

abandon the words of the Constitution as adopted by the citizens of Ohio in 1851, we invade both the authority of the executive branch and the will of the people.

{¶ 53} For the foregoing reasons, I concur, albeit regretfully, in the *per curiam* opinion.

_____

**ALICE ROBIE RESNICK, J., concurring in part and dissenting in part.**

I

{¶ 54} By a stroke of a pen a Governor is authorized by today's opinion to overturn the death penalty verdicts of judges and juries which have been upheld by countless state appellate judges, Supreme Court justices and federal court judges. Today's *per curiam* opinion says it is perfectly acceptable for a Governor in the last days of his or her administration to grant commutations to whomever he or she desires without first awaiting the APA investigation and report. The basis of such a holding is that the Constitution does not specifically authorize regulations "as to the manner of applying for commutations." As a result, only full and absolute pardons are "subject to" any regulations enacted by the General Assembly.

{¶ 55} The *per curiam* opinion misconstrues Section 11, Article III and in the process engages in an inaccurate interpretation of the scope of the Governor's pardoning power.[6] While I agree that the pardon purportedly granted by former Governor Celeste should be invalidated, it is clear to me that the commutations he purportedly granted also should fail for the very same reason advanced for the failure of the pardon.

{¶ 56} The *per curiam* opinion proclaims that Section 11, Article III is unambiguous, and essentially ends its analysis of the "subject to" clause at that point. However, this case involves constitutional interpretation which is not readily

_____

6. It is appropriate to refer to the Governor's "pardoning power" synonymously with "clemency power." The power to commute has historically been understood to be an aspect of the pardoning power. For a thorough discussion of the development and scope of the pardoning power of the President of the United States, see *Hoffa v. Saxbe* (D.D.C.1974), 378 F.Supp. 1221.

22

resolvable by resort solely to hornbook rules of construction, as if in a vacuum, but must be considered with an eye on the historical context underlying Section 11, Article III's evolution into its current form. The *per curiam* opinion, in focusing on a supposed semantical difference between pardons and commutations, does not grasp the importance of this historical development, and thereby fails to comprehend the entire scope of this issue. Section 11, Article III is certainly capable of more than one interpretation, and the reference to the "manner of applying for pardons" is not so clear as the *per curiam* opinion rashly presumes. Given that the constitutional provision is ambiguous, resort to constitutional history is not only appropriate, it is crucial. Even a cursory consideration of constitutional history reveals that the *per curiam* opinion is erroneous.

{¶ 57} The drafters of Section 11, Article III were concerned with precisely the type of abuse of pardoning power which former Governor Celeste accomplished in his last days in office. As this case graphically illustrates, the power to commute is just as easily abused as is the power to pardon. Former Governor Celeste intentionally bypassed established procedures and flouted the constitutional limits on his clemency authority, ignoring the procedural safeguards the Constitution authorizes the General Assembly to put into place regarding the application process for executive clemency. Members of this court are unwilling to give effect to the binding statutory prerequisite for exercise of the clemency power, finding that an APA investigation and recommendation (along with the accompanying required notifications relating to victims' rights) are conditions precedent for the Governor's grant of a pardon, but that no APA involvement is necessary for a commutation.[7]

---

7. With respect to the manner in which the Ohio Adult Parole Authority functions, the trial court found as follows:

"When the APA receives a clemency application, the application is referred to the investigation section of the APA, which prepares a report on the details of the crimes, the applicant's adjustment to prison or the community, and the support available to the applicant in the community. When the completed investigation report is received by the Parole Board, an initial vote is taken whether to immediately recommend against granting clemency or to conduct a hearing. If a hearing

{¶ 58} This seems an especially curious result when one considers that both the pardon and the commutation are aspects of the Governor's clemency power, which has as its source Section 11, Article III.  Given the *per curiam* opinion, when the Governor considers whether to pardon an applicant for clemency, the Governor must wait until the APA process is complete before acting, but if the Governor contemplates a commutation, in the alternative, for that same applicant, the procedural investigation safeguards of the APA can be ignored.  The near schizophrenic result engendered by the *per curiam* opinion makes the point better than any other argument that the Constitution does in fact authorize the General Assembly to regulate the application process for executive clemency, and allows that body to require APA involvement to ensure that the Governor is able to make an informed clemency decision, whether the Governor is considering a pardon or a commutation.

{¶ 59} In order to underscore the magnitude of this case, a brief recapitulation of the circumstances of each defendant's criminal conviction is in order and appropriate.

A

is to be conducted, notice is sent to the local Prosecutor, the sentencing Judge, and those victims or victims' family members designated to receive notice by R.C. §§ 4943.04(A) and 2945.07(A), and as required by R.C. § 2967.12(A) and (B).  These obviously interested individuals are then given the opportunity to submit comments to the APA on whether the applicant should receive clemency. Generally, these individuals are allowed three weeks' time within which to respond to the APA notice.  At the hearing, consisting of a panel of at least a majority of the members  of the  Parole Board, the Board will consider the investigation, the microfiche  records of the Ohio Department of Rehabilitation  and Corrections, and the testimony of the applicant.  After a vote is taken, a report is then prepared for the signature of the board members.  See R.C. §§ 2967.07 and 2967.12.  Usually, there is a two to three week delay after the vote is taken to circulate the recommendations among the voting Board members, who travel to each of Ohio's 22 penal institutions attending hearings. After signature, the APA submits the written report to the Governor which includes a brief statement of the facts in the case, together with the recommendation of the APA.  In such instances that an application is submitted directly to the Governor, it is still required to be channeled back through the APA review process pursuant to R.C. § 2967.07."

{¶ 60} Donald Lee Maurer confessed to the killing of seven-year-old Dawn M. Hendershot. The evidence presented at trial revealed that on September 29, 1982, Maurer drove to a school in Massillon, Ohio, to pick up his stepchildren and a few neighborhood children at the end of the school day. Dawn Hendershot was the first to arrive. Rather than wait for the other children to appear, Maurer decided to depart alone with Dawn. Maurer drove Dawn out into the country to a wooded area, where he stopped the vehicle, removed a twelve-gauge shotgun, and led Dawn into the trees. He then began to sexually molest the girl. At some point Maurer became frightened by his actions and attempted to strangle Dawn with her sweater. When she started to struggle, Maurer shot Dawn in the back, covered her lifeless body with twigs and leaves, and left the scene to return to his home.

{¶ 61} A jury found Maurer guilty of aggravated murder with a specification, kidnapping, and gross sexual imposition. The trial court adopted the jury's recommendation that the defendant be executed. His conviction and sentence were affirmed on direct appeal to the court of appeals and this court. See *State v. Maurer* (Feb. 13, 1984), Stark App. No. CA-6166, unreported, 1984 WL 4469, *affirmed* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768. On January 10, 1991, former Governor Celeste purportedly commuted Donald Maurer's death sentence to life imprisonment without parole eligibility.

B

{¶ 62} Leonard Jenkins was convicted of aggravated murder with specifications, eight counts of robbery, one count of attempted murder and five counts of kidnapping. The convictions stemmed from a robbery that occurred in Cuyahoga County, Ohio, on October 21, 1981. Jenkins and another individual entered a branch office of National City Bank and held bank employees and patrons at gunpoint. During the robbery, Jenkins observed a police officer, Anthony Johnson, approach the front door of the bank and peer inside. Upon seeing the officer, Jenkins stated that he and his partner would have to shoot their way out of

the bank.  Officer Johnson was mortally injured by a gunshot to the head when Jenkins exited the bank and the two exchanged gunfire.  A jury recommended and the trial court imposed a sentence of death.  His conviction and sentence were affirmed on direct appeal to the court of appeals and to this court.  See *State v. Jenkins* (Feb. 24, 1984), Cuyahoga App. No. 45231, unreported, 1984 WL 14150, *affirmed* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264.  On January 10, 1991, former Governor Celeste purportedly commuted Jenkins death sentence to life imprisonment without parole eligibility.

C

{¶ 63} A jury convicted Debra Brown of the murder of fifteen-year-old Tonnie Storey.  The evidence showed that on the morning of July 11, 1984, Tonnie left her home in Cincinnati to attend summer school.  She was last seen on that day with a man identified as Alton Coleman and a woman matching Brown's description.  On July 19, 1984, a realtor entered an abandoned building that he was preparing to show to a prospective buyer and found a partially decomposed body.  Scrawled above the body on the wall were the words "I hate niggers death."  Police ultimately identified the body as that of Tonnie Storey.  The evidence presented during trial included Brown's fingerprints on a Michael Jackson button Tonnie had been wearing the day she disappeared.  Brown admitted to another individual that she had killed Tonnie "for her clothes" and that she, Brown, "had to do what [she] had to do."  The state further introduced evidence linking Brown *to at least five other murders* and several other attempted murders or assaults.  After finding Brown guilty of Tonnie's murder, the jury recommended and the trial judge imposed a sentence of death.  Her conviction and sentence were affirmed in a direct appeal to the court of appeals and to this court.  See *State v. Brown* (Apr. 15, 1987), Hamilton App. No. C-850434, unreported, 1987 WL 9743, *affirmed* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523.  On January 10, 1991, former  Governor Celeste

purportedly commuted Brown's death sentence to life imprisonment without parole eligibility.

## D

{¶ 64} On the morning of August 5, 1983, Willie Lee Jester entered an AmeriTrust Company branch office in Cleveland, Ohio, soon after it opened for the day. Jester approached Patrolman Benjamin Grair, the bank's security guard, while he was sitting at a desk speaking on the telephone and shot him in the chest. Jester then ran to the bank counter, leaped over it, and took a total of $3,122 from a teller's drawer. Patrolman Grair died as a result of the gunshot wound to his torso. The fatal injuries to his heart, right lung and liver were caused by a single, hollow-point bullet—a bullet specifically designed to cause more damage than a smooth-point bullet. Upon finding Jester guilty of aggravated murder with two specifications, the jury recommended and the trial court imposed a sentence of death. The conviction and sentence were affirmed in a direct appeal to the court of appeals and to this court. See *State v. Jester* (Sept. 26, 1985), Cuyahoga App. No. 49065, unreported, 1985 WL 8631, *affirmed* (1987), 32 Ohio St.3d 147, 512 N.E.2d 962. On January 10, 1991, former Governor Celeste purportedly commuted the death sentence to life imprisonment without parole eligibility.

## E

{¶ 65} A three-judge panel in Hamilton County convicted and sentenced Elizabeth Green to death for aggravated murder and to a consecutive term of ten to twenty-five years for aggravated robbery. The convictions stemmed from the killing and robbery of Thomas Willis, a neighbor of one of Green's friends, Belinda Coulter. On January 4, 1988, Coulter sold Willis some food stamps so that she and Green could in turn use the cash to purchase drugs. Later that day, Green, with Coulter, entered Willis's apartment wearing socks on her hands so as to avoid leaving any fingerprints. Green then stabbed Willis and took his money. Thomas Willis died as a result of one hundred nine knife wounds to his neck, torso and arms.

Green admitted to a psychologist that she had participated in the attack but claimed she had stabbed Willis only three times. Green's conviction and sentence of death were affirmed in a direct appeal to the court of appeals and to this court. See *State v. Green* (July 11, 1990), Hamilton App. No. C-880504, unreported, 1990 WL 95357, *affirmed* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253. On January 10, 1991, former Governor Celeste purportedly commuted Green's death sentence to life imprisonment without parole eligibility.

F

{¶ 66} A jury convicted Lee "Crazy Horse" Seiber of aggravated murder with three death penalty specifications in connection with the killing of Stanton Norris. On May 21, 1985, Seiber entered a Columbus bar for the second time that evening, carrying a loaded, cocked .38 caliber revolver. An accomplice stood at the closed front door, shotgun in hand, barring anyone from leaving. Seiber had returned to the bar to confront two men, Alvie and Louis Schoenberger, one of whom had criticized Seiber during his earlier visit for making lewd remarks to a woman in the bar. After forcing the brothers to lie face down on the floor and holding them at gunpoint, Seiber threatened the crowd and tried to find out who were friends of the Schoenbergers. Stanton Norris, who was drinking a beer at the bar, admitted to being a friend of the Schoenbergers. When Norris refused to comply with his order to lie face down on the floor, Seiber grabbed Norris by the shoulders and fatally shot him in the back. The jury recommended and the trial court imposed a sentence of death. Seiber's conviction and sentence were affirmed on direct appeal to the court of appeals and to this court. See *State v. Seiber* (June 8, 1989), Franklin App. No. 87AP-530, unreported, 1989 WL 61733, *affirmed* (1990), 56 Ohio St.3d 4, 564 N.E.2d 408. On January 10, 1991, former Governor Celeste purportedly commuted the death sentence to life imprisonment without parole eligibility.

G

{¶ 67} Rosalie Grant was convicted by a jury of two counts of aggravated murder, each with two death penalty specifications, and one count of aggravated arson. The evidence presented at trial revealed that around 6:00 a.m. on April 1, 1983, a fire ignited in the bedroom of Grant's two infant sons, one-year-old Donovan and two-year-old Joseph. The boys died in the fire as a result of severe burns and smoke inhalation. Grant, however, escaped from the burning house entirely unharmed, fully dressed in pants, jacket, shoes and socks, with unsinged hair, no soot on her face or eyes, and free of any signs of smoke inhalation. Other than Grant's claim that she had tried to save her babies when the smoke first awoke her, there was no evidence presented that Grant had attempted to put out the fire or to save the children. Arson investigators determined that the fire had been intentionally set and fueled by a liquid accelerant. No determination was made as to the exact type of accelerant that had been used. The evidence also revealed that approximately two weeks before the fire, Grant had purchased $5,000 worth of life insurance for each of the boys with Grant listed as the beneficiary. Grant had not purchased a policy for herself or for her three-year-old daughter Shylene, who was living elsewhere. Furthermore, a can of charcoal lighter fluid, bearing Grant's fingerprints, and a partially burned kitchen chair matching those in Grant's home were found four days after the fire in a nearby vacant house. The conviction and sentence were affirmed on direct appeal to the court of appeals and to this court. See *State v. Grant* (Nov. 9, 1990), Mahoning App. No. 83 C.A. 144, unreported, 1990 WL 176825, *affirmed* (1993), 67 Ohio St.3d 465, 620 N.E.2d 50. On January 10, 1991, former Governor Celeste purportedly commuted Grant's death sentence to life imprisonment with no restriction as to parole eligibility.

H

{¶ 68} According to the court of appeals' opinion, in May 1979, Ralph F. DeLeo pled guilty to the murder of Dr. Walter Bond. After pleading guilty, DeLeo was immediately sentenced to an indefinite term of fifteen years to life

imprisonment. In 1989, the court of appeals affirmed the trial court's dismissal of DeLeo's petition for enforcement of a plea bargain as to parole, or, in the alternative, a petition to vacate the conviction and sentence. See *State v. DeLeo* (Sept. 19, 1989), Franklin App. No. 89AP-107, unreported, 1989 WL 107559. On January 10, 1991, former Governor Celeste purportedly commuted DeLeo's sentence to time served.

I

{¶ 69} A jury convicted John Salim of felonious assault with violence and gun specifications in connection with an incident that occurred on January 23, 1988. The evidence, as set forth in the court of appeals' opinion, showed that on that date Salim fired a gun at William Terbrack as the latter prepared to drive out of a hardware store parking lot. A bullet was retrieved from the window post on the passenger side of Terbrack's car. Salim was sentenced to three years' actual incarceration for the gun specification to be served prior to a three-to fifteen-year term for felonious assault. The conviction and sentence were affirmed on appeal to the court of appeals. See *State v. Salim* (May 17, 1990), Cuyahoga App. Nos. 56925 and 57964, unreported, 1990 WL 66467. On January 10, 1991, former Governor Celeste purportedly granted Salim a full pardon. As the above facts indicate, among those who purportedly received clemency from former Governor Celeste were some of the most notorious killers on death row. Celeste made the clemency decisions without awaiting the APA investigation and report. Yet, given the *per curiam* opinion, only the unfortunate John Salim, who supposed he had received a full pardon (as opposed to a commutation), must pay the price for Celeste's wholesale disregard of the Constitution.

II

{¶ 70} While I agree with the *per curiam* opinion that Section 11, Article III of the Ohio Constitution authorizes the General Assembly to prescribe procedural regulations as to the application process for executive clemency, my

interpretation of Section 11, Article III convinces me that the authority granted by the "subject to" clause to regulate "the manner of applying for pardons" includes commutations. The *per curiam* opinion pays lip service to the history behind the evolution of current Section 11, Article III, without realizing the consequences of that evolution. A thoughtful analysis of the addition of the "subject to" requirement of the Ohio Constitution should include consideration of the reason that clause was added. The *per curiam* opinion fails to consider and put into effect the intention of the drafters of Section 11, Article III.

{¶ 71} At the 1850-1851 Ohio Constitutional Convention, the debate on Section 11, Article III was limited to the so-called reporting requirement, the last sentence of Section 11, Article III. A delegate, Mr. Riddle, commenting on the insertion of the clause, stated: "It was known that the exercise of [the pardoning] power was much complained of. * * * [I]t was but too easy to excite the sympathies of men in behalf of the convicted criminal. Gentlemen of the committee were aware from their own experience that they had often put their names to papers soliciting reprieves and pardons on the representation of persons, in whom they had confidence. They knew also that persons in the same manner might influence the governor; and they further knew that on the strength of that influence brought to bear on him by the names of persons standing high in society he often exercised that power in instances in which the public could not see any propriety. The power, no doubt, had been abused, but when they looked into the entire matter they would find that no blame could be attached to the Governor." 1 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio 1850-1851(1851) 306-307.

{¶ 72} In choosing to alter its constitutional provision on executive clemency, Ohio adopted a provision remarkably similar to that incorporated by the

state of New York into its Constitution of 1846.[8]  Only a brief discussion of the New York debates is necessary to illustrate that Ohio's drafters of Section 11, Article III must have been motivated by the same concerns as New York's drafters when they decided to place restrictions on the Governor's pardoning power.  The recorded proceedings of the New York Constitutional Convention which authored the provision altering that state's executive pardoning powers reveal that the provision was extensively debated.  In particular, several amendments were offered relative to restrictions on the Governor's pardoning power, including one, by a Mr. Chatfield, that would have greatly curtailed the Governor's pardoning power by making it subject to "such restrictions as may be prescribed by law."  Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of New York (1846) 351.  This Chatfield amendment ultimately was rejected, *id.* at 353, and the wording "subject to such regulations as may be provided by law relative to the manner of applying for pardons," proposed by Mr. Taylor, was adopted.  In support of his position, Mr. Taylor "agreed that there should be some conditions relative to the manner of applying the power, and he would offer an amendment to carry his idea out in relation to that.  This would leave the

---

8.  Section 5, Article IV of the New York Constitution of 1846 provided:

"The governor shall have the power to grant reprieves, commutations, and pardons after conviction, for all offenses except treason and cases of impeachment, upon such conditions and with such restrictions and limitations, as he may think proper, subject to such regulation as may be provided by law relative to the manner of applying for pardons. * * * He shall annually communicate to the legislature each case of reprieve, commutation, or pardon granted, stating the name of the convict, the crime of which he was convicted, the sentence and its date, and the date of the commutation, pardon or reprieve."  New York State Constitution Annotated (1938) 54.

When Ohio's Constitutional Convention of 1850-1851 discussed the substance of what was to become Section 11, Article III of the Constitution of 1851, the Standing Committee on the Executive Department presented for debate a draft version on executive clemency which very closely resembled Section 5, Article IV of the New York Constitution of 1846.  For the language of this draft version, see 1 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio 1850-1851 (1851) 300.  The text of the draft version is reproduced in footnote 6 of this opinion.

Legislature to provide rules for its carrying out, leaving the exercise of the power entirely with the Governor." *Id.* at 357.

{¶ 73} Since the "subject to" clause of Section 11, Article III of the Ohio Constitution mirrors so closely the language of New York's comparable section, it is fair to assume that the Ohio delegates of 1850-1851 shared New York's concerns about abuses of the pardoning power, while also sharing the conviction of New York's delegates that the Governor's ultimate discretion to exercise the pardoning power should not be infringed. The "subject to" clause is a compromise which reflects those concerns.

{¶ 74} Ohio's 1802 Constitution, in Section 5, Article II, gave the Governor "the power to grant reprieves and pardons." No mention of commutations was included in this authorization. The word "commutations" was added in 1851 to Section 11, Article III at the Constitutional Convention of 1850-1851, which also added the "subject to" clause at the end of the same sentence.

{¶ 75} "The terms 'pardon' and 'reprieve' have been adopted into the constitution of this state without defining or explaining them." *Sterling v. Drake* (1876), 29 Ohio St. 457, 460. Just as "pardon" and "reprieve" are not defined in the Constitution, "commutation" also is not defined, so that we must look to the common law for its meaning. Although current statutes define these terms,[9] those

---

9. R.C. 2967.01(B) provides:

"'Pardon' means the remission of penalty by the governor in accordance with the power vested in him by the constitution. Pardons may be granted after conviction and may be absolute and entire, or partial, and may be granted upon conditions precedent or subsequent."

R.C. 2967.01(C) provides:

"'Commutation' or 'commutation of sentence' means the substitution by the governor of a lesser for a greater punishment. A sentence may be commuted without the consent of the convict, except when granted upon the acceptance and performance by the convict of conditions precedent. After commutation, the commuted sentence shall be the only one in existence. The commutation may be stated in terms of commuting from a named crime to a lesser included crime, in terms of commuting from a minimum and maximum sentence in months and years to a minimum and maximum sentence in months and years, or in terms of commuting from one definite sentence in months and years to a lesser definite sentence in months and years."

R.C. 2967.01(D) provides:

statutory definitions do not necessarily control the consideration of their meanings in the Constitution.

{¶ 76} In *State ex rel. Gordon v. Zangerle* (1940), 136 Ohio St. 371, 375, 16 O.O. 536, 538, 26 N.E.2d 190, 194, the court considered the "scope of the executive power" conferred by Section 11, Article III, determining that the common-law meaning of the terms "reprieves" and "commutations" are "not materially different" from the statutory definitions (which are the same today). Thus, the court noted, a reprieve was defined as "'the temporary suspension by the Governor of the execution of a sentence,'[10] and commutation of sentence as 'the substitution of a lesser for a greater punishment.'" *Id.*

{¶ 77} The *Gordon* court went on to consider the definition of "pardon" and the different forms of pardon:

"A pardon may be absolute or conditional, full or partial; and a conditional pardon may be granted upon conditions precedent or subsequent.

---

"'Reprieve' means the temporary suspension by the governor of the execution of a sentence. A reprieve may be granted without the consent of and against the will of the convict."

10. I agree that reprieves do not fall within the broader meaning of "pardons." Reprieves and pardons are recognized as being fundamentally different at common law because a reprieve is temporary. However, pardons and commutations are not recognized as fundamentally different at common law, but are interrelated concepts. Even though the power to grant reprieves often is said to come within the scope of the Governor's pardoning power, a constitutional provision allowing procedural regulation of "the manner of applying for pardons" does not allow for regulation of the manner of applying for reprieves. Because of this fundamental difference between reprieves and pardons, Section 5, Article II of Ohio's 1802 Constitution, and Section 2, Article II of the United States Constitution each conferred upon the executive the power to grant both reprieves and pardons.

The General Assembly has recognized the fundamental difference between pardons and reprieves. R.C. 2967.08 provides that "[t]he governor may grant a reprieve for a definite time to a person under sentence of death, with or without notices or application." This provision obviously recognizes the importance of prompt action in some reprieve cases and makes clear that procedural requirements need not be fulfilled before a reprieve may be granted. In addition, R.C. 2967.03, authorizing the Adult Parole Authority to recommend a pardon, commutation, or reprieve to the Governor, provides procedural requirements which must be fulfilled before the authority may recommend a pardon or commutation, but any such requirements regarding the recommendation of a reprieve are conspicuously absent.

"A full pardon purges away all guilt and leaves the recipient from a legal standpoint, in the same condition as if the crime had never been committed (*Knapp v. Thomas*, 39 Ohio St., 377, 381, 48 Am. Rep., 462); a partial pardon releases from punishment without remission of guilt. *Lee v. Murphy*, 63 Va. (22 Gratt.), 789, 12 Am. Rep., 563. The essential characteristics of full and partial pardons are such that either may be granted with or without conditions. * * *

"An absolute pardon sets the accused free from the custody of the law, prevents further court action, terminates existing probation and makes anticipated probation impossible. * * *

"The power of executive pardon carries with it, as incidental thereto, the right to impose such valid conditions, precedent or subsequent, as the pardoning power may determine.* * *" *Gordon*, 136 Ohio St. at 376-377, 16 O.O. at 538, 26 N.E.2d at 194.

{¶ 78} The *per curiam* opinion appears to equate "pardon" with "full and unconditional pardon." However, as the passage from *Gordon* illustrates, the word "pardon" encompasses several concepts. A "full and unconditional" pardon, which purges all guilt and places the recipient in the same position as if no crime had been committed, is only one subset of the several types of pardons. Another type of pardon, a "partial" pardon, which releases from punishment without remitting guilt, appears to be virtually synonymous with a "commutation," which substitutes a lesser for a greater punishment, but does not remit guilt. Any definition of "pardon" which limits its meaning to clemency actions of the Governor that remit guilt is a narrow definition. While this narrow definition may appropriately be applied in some situations, the common-law meaning of "pardon," when applied in the broader sense, also can easily encompass the concept of commutation, so that commutation is a subset of pardon.

{¶ 79} The *per curiam* opinion's citation of *State ex rel. Atty. Gen. v. Peters* (1885), 43 Ohio St. 629, 4 N.E. 81, does not establish that pardons and

commutations are in all cases mutually exclusive terms. In fact, the per curiam opinion includes *Peters's* definition of pardon among the material quoted from that case: "A pardon discharges the individual designated from all or *some* specified penal consequences of his crime. It may be full or *partial*, absolute or conditional." (Emphasis added.) *Id.* at 650, 4 N.E. at 87. By the *Peters* definition, a partial pardon (which discharges the individual from "some * * * penal consequences of his crime") is a pardon just as a "full and absolute pardon" is a pardon. The very language quoted belies the *per curiam* opinion's conclusion. The constitutional meaning of "pardon," as well as the common-law meaning of the word, is by no means precise. It is not possible, as the *per curiam* opinion attempts, to conclude that pardons and commutations are two totally distinct concepts. Recognition of the ambiguity in the word "pardon" instead leads to the conclusion that commutation is a subset of pardon when pardon is used in the inclusive sense, and that the "subject to" clause clearly does provide the authority to regulate commutations.

{¶ 80} In this case, defendant Ralph DeLeo purportedly received a commutation to time served, while defendant John Salim purportedly received a full pardon. The *per curiam* opinion upholds DeLeo's purported commutation, but invalidates Salim's purported full pardon. Yet, under the definition of "pardon" set forth in *Peters* and in *Gordon*, what DeLeo purportedly received could just as easily be termed a partial pardon, in which case, presumably according to the *per curiam* opinion, Governor Celeste would have had to await the APA investigation and recommendation before granting clemency to time served. This point, as much as any other, belies the *per curiam* opinion's assertion that the word "pardon" is used with precision throughout Section 11, Article III.

{¶ 81} When Section 11, Article III was adopted in 1851 and the power of commutation was specifically mentioned as one of the Governor's clemency powers, the delegates to the Constitutional Convention of 1850-1851 were either

36

conferring a new power for the Governor to exercise, or they were explicitly conferring a power which had been implicit in the 1802 Constitution's conferral of the power to grant pardons. If the delegates were conferring a new power, then it would be safe to assume that the power to grant commutations was considered to be something different from the power to grant pardons, and was not to be made subject to regulations "as to the manner of applying for pardons." But if the delegates were confirming a power which already existed under the power to grant pardons, then it may be fairly concluded that the use of the phrase "as to the manner of applying for pardons" in the "subject to" clause was meant to include the commutation power. If the latter is the case, and if the word "pardon" is broad enough to encompass the word "commutation" in this way, then Section 11, Article III uses "pardon" in two senses: in a limited way as one aspect of the clemency powers in the first clause of the first sentence of Section 11, Article III, and also, in the "subject to" clause, in an expansive way that includes the concept of "commutation."

{¶ 82} The records of the debates of the Ohio Constitutional Convention of 1850-1851 give no insight into why the "subject to" clause of Section 11, Article III uses the words "as to the manner of applying for pardons," or into whether Section 5, Article II of the Ohio Constitution of 1802 conferred on Ohio's Governor the power to commute sentences.

{¶ 83} However, the discussions regarding the addition of the reporting requirement to the executive clemency provision of the Constitution at the 1850-1851 Constitutional Convention do reveal that many of the delegates indiscriminately used the term "pardon" to refer generically to the Governor's clemency power.

{¶ 84} One delegate, Mr. Riddle, stated that "[t]he [Executive Department] committee inserted that clause [the reporting requirement] into the report for the purpose, that the legislature at its annual or biennial sessions might know what the

Governor had done during the vacation in the exercise of the *pardoning power*." (Emphasis added.) 1 Debates and Proceedings, *supra*, at 306. Because the reporting requirement as proposed required the Governor to communicate "each case of reprieve, commutation, or pardon granted," *id.* at 300,[11] Mr. Riddle thus used the inclusive term "pardoning power" to refer to the power to grant any type of executive clemency.

{¶ 85} Similarly, another delegate, Mr. McCormick, thought that the provision requiring the Governor to report each reprieve, commutation, or pardon granted "required nothing to be communicated to the Legislature except the names of the persons *pardoned*. If men had interfered improperly in getting reprieves for criminals, there was nothing in that section as it now stood, which required the naming of the persons who interfered to obtain it * * *. The only object to be gained by this section was the ascertainment of the number of prisoners *pardoned* * * *." (Emphasis added.) *Id.* at 307. Mr. McCormick thus used the word "pardon" in a broad sense to refer to any act of executive clemency.

{¶ 86} Another delegate, Mr. Stanton, opposed a proposal to further require the Governor to report the names of all persons who had applied for a reprieve, pardon or commutation. "He supposed that the latter part of the section was intended for the purpose of making the Governor accountable to the people for the

---

11. As reported by Mr. Leadbetter from the Standing Committee on the Executive Department, the provision later incorporated into the Constitution of 1851 as Section 11, Article III originally read:

"Sec. 11. The Governor shall have the power to grant reprieves, commutations and pardons after conviction, for all offenses, except treason, and cases of impeachment, upon such conditions, and such restrictions and limitations as he may think proper, subject to such regulations as may be provided by law, relative to the manner of applying for pardons. Upon conviction for treason, he shall have power to suspend the execution of the sentence, until the case shall be reported to the Legislature at its next meeting, when the Legislature shall either pardon, commute the sentence, direct the execution of the sentence, or grant a further reprieve. He shall annually communicate to the Legislature each case of reprieve, commutation, or pardon granted; stating the name of the convict, the crime for which he was convicted, the sentence and its date, and the date of the commutation, pardon or reprieve." 1 Debates and Proceedings, *supra*, at 300.

The report of the Executive Committee reached its present form as Section 11, Article III after proposed amendments to the committee report were debated by the delegates and voted on.

exercise of the *pardoning power*, and to inform them whom he had pardoned." (Emphasis added.) *Id.*

{¶ 87} Yet another delegate, Mr. Larwill, stated that "[t]he Governor would no doubt have good reasons for exercising the *pardoning power*." (Emphasis added.) *Id.*

{¶ 88} These delegates' statements persuasively refute defendants' argument that the framers of Section 11, Article III used the word "pardon" in a narrow sense that did not include the concept of commutation. Many of the delegates at the Constitutional Convention of 1850-1851 used "pardoning power" to mean clemency power. Furthermore, the word "pardon" was used to refer to any executive exercise of the clemency power.

{¶ 89} Not long after Ohio (in 1851) had amended its Constitution's executive clemency provision to specifically include the power to grant commutations, the United States Supreme Court decided *Ex Parte Wells* (1855), 59 U.S. (18 How.) 307, 15 L.Ed. 421. In the words of the court:

"The petitioner was convicted of murder in the District of Columbia, and sentenced to be hung on the 23d of April, 1852. President Fillmore granted to him a conditional pardon. The material part of it is as follows: 'For divers good and sufficient reasons I have granted, and do hereby grant unto him, the said William Wells, a pardon of the offense of which he was convicted—upon condition that he be imprisoned during his natural life; that is, the sentence of death is hereby commuted to imprisonment for life * * *.'" *Id.* at 308, 15 L.Ed. at 423.

{¶ 90} Wells petitioned for a writ of habeas corpus, pointing out that Section 2, Article II of the United States Constitution authorizes the President to grant pardons and reprieves, but does not explicitly authorize the President to place conditions upon a grant of pardon. Wells argued that Section 2, Article II authorizes only absolute pardons, and that since he had been pardoned under the authority conferred by that section, he must have received such an absolute pardon

with a void condition, so that his sentence actually was remitted entirely. *Id.* at 309, 15 L.Ed. at 423. The Circuit Court of the District of Columbia refused the application, and the Supreme Court affirmed.

{¶ 91} The court in *Ex parte Wells* determined that the President's power to grant "conditional pardons"[12] (commutations) was implicit within the power to grant "reprieves and pardons" conferred by Section 2, Article II of the United States Constitution. In so determining, the court found that the petitioner's argument was mistaken, "arising from the want of due consideration of the legal meaning of the word pardon. It is supposed that it was meant to be used exclusively with reference to an absolute pardon, exempting a criminal from the punishment which the law inflicts for a crime he has committed." 59 U.S. (18 How.) at 309, 15 L.Ed. at 423.

{¶ 92} The *Ex parte Wells* court determined that the word "pardon" is not so narrow as to include only an "absolute pardon": "In the law it has different meanings, which were as well understood when the Constitution was made as any other legal word in the Constitution now is." *Id*. at 310, 15 L.Ed. at 423. The court went on to state that "[i]n this view of the constitution, by giving to its words their proper meaning, the power to pardon conditionally is not one of inference at all, but one conferred in terms.

---

12. The court of appeals in the case *sub judice* went to some lengths to distinguish between a commutation and a conditional pardon, basing the distinction in part upon the necessity of acceptance by the recipient before a conditional pardon is valid. However, one major factor that separates the two is the attachment of a condition, which is what makes a conditional pardon "conditional." In the same way that a pardon can have a condition attached, a commutation can also be subject to a condition. It is when the condition is attached that the recipient must consent before the conditional pardon or conditional commutation is effective. No consent is required when no condition is attached to the pardon or commutation. *In re Victor* (1877), 31 Ohio St. 206, paragraph three of the syllabus, recognized that in Ohio, a commutation is not the same as a conditional pardon, even though the *Ex parte Wells* court stated that it was for purposes of interpreting the United States Constitution. Since *Victor* presumed that a commutation is "for the culprit's benefit," no acceptance of an unconditional commutation is required for its validity. See 31 Ohio St. 206, at paragraph three of the syllabus.

{¶ 93} "The mistake in the argument is, in considering an incident of the power to pardon the exercise of a new power, instead of its being a part of the power to pardon." *Id.* at 315, 15 L.Ed. at 425.

{¶ 94} If the United States Supreme Court determined in 1855 that the President's power to commute a sentence is implicit in the power to pardon, it is reasonable to assume that Ohio's Governors operating under the authority of the state's 1802 Constitution also had the implicit power to commute sentences, since the 1802 Ohio Constitution's provision on executive clemency closely resembled that of the United States Constitution. The delegates to the 1850-1851 Constitutional Convention therefore did not add a totally new power to the Constitution by adding the word "commutations" in adopting Section 11, Article III, but affirmed a power the Governor already possessed.[13]

{¶ 95} It is apparent that the inclusion of "commutations" in the first line of Section 11, Article III as one of the Governor's clemency powers was done to quiet doubt that the power to pardon was so limited that it did not include the power to commute. The meaning of "pardon" was not thereby magically altered into some precise word with only one connotation. The statements of the delegates to the 1850-1851 Constitutional Convention indicate the imprecision of the word "pardon." In addition, R.C. 2967.01(B)'s provision that pardons may be "partial," and the *Peters* and *Gordon* courts' recognition of partial pardons, further demonstrate that a "full and absolute pardon" is only one type of pardon, and that there is an overlap between the generic sense of the word "pardon" and the concept

---

13. One researcher has determined that the power to commute is implicit within the power to pardon:

"The [Ohio] Constitutional Convention of 1851 added the term 'commutation' to the pardon provision in present section 11 of Article III. However, the term 'commutation,' although not used in early constitutions, has long been interpreted as being included within pardon, and texts have often not disassociated the power to commute from the power to pardon." 3 Ohio Constitutional Revision Commission 1970-1977, Proceedings & Research of the Legislative-Executive Committee (Mar. 31, 1972), Research Study No. 11.

of commutation. Thus, since the power of commutation can be understood to be contained within the power to pardon (in its broad sense) Section 11, Article III's provision that the Governor's power to commute (as well as to pardon) is "subject * * * to * * * regulations, as to the manner of applying for pardons" is broad enough to include regulations as to the manner of applying for commutations.

{¶ 96} In short, even though the power to grant commutations may be a power distinct from the power to grant pardons, the common-law meaning of "pardon" included "commutation." Section 11, Article III clearly subjects the Governor's power to grant commutations, as well as the Governor's power to grant pardons, to authorized regulations. Hence the Governor's power to grant commutations pursuant to Section 11, Article III is subject to regulations enacted by the General Assembly as to the application process.

{¶ 97} Defendants argue that the omission of the word "commutations" from the "subject to" clause of Section 11, Article III reflects a conscious decision by the drafters to make only the manner of applying for pardons, and not commutations, subject to regulation. Defendants claim that a pardon, because it remits guilt as well as punishment so that the recipient is in the same position as if no crime had been committed, is the ultimate act and was meant to be singled out. They further claim that a commutation, which merely reduces punishment without remitting guilt, is a lesser degree of clemency and so was intentionally left out of the "subject to" clause.

{¶ 98} Defendants' reasoning is specious. Although a "full and unconditional" pardon is the ultimate pardon, whether a commutation differs greatly from a pardon is in the eye of the beholder. To the recipient of a full and unconditional pardon, that pardon is much different from a commutation (even a commutation to time served, which would also remit punishment) because the full pardon relieves the recipient of disabilities associated with the finding of guilt and wipes the record clean. However, to society as a whole, there is virtually no

42

difference between a commutation to time served and a full pardon. As mentioned earlier, defendant DeLeo in this case was purportedly granted a commutation to time served, and defendant Salim was purportedly granted a full pardon, yet the action of Governor Celeste allowed both offenders to receive clemency despite the determination of guilt in the judicial system which led to the imposition of the original longer terms of punishment. Although some of the purported commutations in this case reduced a death sentence to life imprisonment without parole, and so did not effect the release of the recipients, commutations, like pardons, are very significant actions by the Governor. To permit a Governor in the last hours of his term to grant commutations without first applying to the APA would be a devastating blow in a day when victims' rights are finally being recognized. One of the most important factors under R.C. Chapter 2967 is the requirement that at least three weeks before the APA recommends any pardon or commutation, notice of the pendency of the clemency application must be "sent to the prosecuting attorney and the judge of the court of common pleas of the county in which the indictment against the convict was found." R.C. 2967.12. Additionally, under certain circumstances the APA must send a similar notice to the victim of the crime, or to a representative member of the victim's family. R.C. 2967.12(B). There are very good reasons for these requirements. One is to avoid the shock the families of the victims would encounter when they first hear over the news that the sentences of the convicts who senselessly murdered their loved ones were commuted.

{¶ 99} Lastly, the doctrine of *expressio unius est exclusion alterius* has no application regarding the "subject to" clause. Even though the words "commutation" and "pardon" appear together elsewhere three times in Section 11, Article III, the fact that the "subject to" clause does not specifically mention commutations does not require a narrow reading of the word "pardons" in that clause. It is readily apparent that the "subject to" clause was inserted into Section

11, Article III as a compromise to regulate the application process invoking the entire clemency power, and not just the power to grant pardons (with pardon used in its narrow sense). More significantly, consideration of the debates of the Ohio Constitutional Convention of 1850-1851 regarding the reporting requirement of Section 11, Article III makes it readily apparent that the drafters did not use the terms "pardon" and "commutation" with the precision which would require a finding that "pardons" in the "subject to" clause does not include commutations.

{¶ 100} Since the application process leading to the Governor's grant of clemency was seen as subject to abuse, the drafters of Section 11, Article III allowed regulations to be prescribed to curb that abuse. Those regulations were authorized for the application *process*, whether initiated by the applicant (or someone on the applicant's behalf) or by the Governor, but the power of the Governor to act is specifically exercised subject to the regulations. A Governor may in certain situations choose to grant only a commutation when the applicant may have applied for a full pardon. The interrelationship of the concepts of pardon and commutation cannot be ignored, an interrelationship obviously recognized by the reported statements of the delegates to the Ohio Constitutional Convention of 1850-1851. It is inconceivable that the omission of the word "commutation" from the "subject to" clause was intended to exclude commutations from regulation.

### III

{¶ 101} From the foregoing it is apparent that Section 11, Article III authorizes the General Assembly to regulate the application process for executive clemency, whether it is a pardon or a commutation which is being considered. I emphatically disagree with the *per curiam* opinion's conclusion that Section 11, Article III authorizes regulations only with respect to pardons, and not commutations. The *per curiam* opinion's misguided attempt to sever the supposedly offending portions of R.C. 2967.07 is made necessary by its equally misguided conclusion that the Governor's power to commute sentences is

unfettered by the Constitution. R.C. 2967.07 is constitutional *in toto*, and makes APA involvement mandatory before the Governor may grant a pardon or a commutation.

{¶ 102} In view of today's decision it should become a top priority of the citizens of this state to ensure that such reckless behavior on the part of a Governor will not be repeated. It is ironic that the reasons for amending the Constitution today are similar to the reasons the 1850-1851 Constitutional Convention amended the Constitution of 1802. The delegates to the 1850-1851 Constitutional Convention felt the need to enumerate the Governor's pardoning powers. Even though the 1802 Constitution did give the Governor power to commute, there remained a small degree of doubt (later put to rest by the United States Supreme Court in *Ex parte Wells*) that it did not, so the Ohio Constitution was amended to clarify the matter. In much the same way, it appears that our Constitution must be amended to specify that the manner of applying for clemency includes applications for commutations as well as for pardons. While it is clear to me that no such amendment should be necessary, members of this court do not agree. After this case, I am strongly convinced that it is time for the people of Ohio to consider a constitutional amendment placing explicit and unavoidable limitations on the Governor's clemency power (including the power to pardon and to commute, but not to reprieve), to go so far as to place specific limits on the Governor's discretion in the use of the power. While I agree that the pardoning power is an indispensable aspect of our criminal justice system, the pardoning power is too important to be trusted with relatively few conditions to the unfettered whims of a lame duck Governor.

{¶ 103} I would reverse the judgment of the court of appeals in case No. 93-1165 and reinstate the declaratory judgment of the trial court that the purported pardon and commutations are invalid.

DOUGLAS and F.E. SWEENEY, JJ., concur in the foregoing opinion.

_____